**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**


Russell J Terry

                              Plaintiff,


VS.                                                    CIVIL ACTION NO. _____


The Federal Bureau of Investigation (FBI)

935 Pennsylvania Avenue, N.W.

Washington, D.C., 20535-0001,


Bureau of Consular Affairs (CA)

600 19th Street, NW

Washington, D.C., 20036,


                              Defendants.

_____


**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**PLAINTIFF'S STATEMENT OF PURPOSE**

The Plaintiff respectfully requests the court's immediate consideration pursuant to Federal Rule

of Civil Procedure 65 for a preliminary injunction.  The urgency of the situation requires the

court's intervention to safeguard the safety and fundamental rights of the parties involved,

prevent further irreparable harm to evidence and witnesses, and maintain the current state of

affairs.

Injunctive Relief:

1. **FOIA:** The Plaintiff seeks injunctive and other appropriate relief for the disclosure and release of agency records improperly withheld by the FBI.

2. The Plaintiff was released personal information on two FOIA requests to the FBI, both of which lack transparency in providing complete access to the Plaintiff's records. The Plaintiff hereby requests the FBI to address the following inquiries concerning his personal records held by the FBI within 30 days:

    a. Please confirm receipt of Administrative Claims delivered on 11/10/2022, March 27, 2023, April 23, 2023, and June 26, 2023.

    b. Kindly confirm whether there exist any FBI E-tips originating from the Plaintiff during the years 2019 and 2020.

    c. Please confirm whether there are any FBI records pertaining to a company known as Gulfstream, that was located at 633 West Fifth Street, Los Angeles, CA 90071.  Where the Plaintiff held a position as an officer between the years 2006 and 2008.  The Plaintiff emailed answers to questions from the FBI in May 2008.

    d. Kindly confirm whether there exist any FBI records detailing interactions between FBI agents and the Plaintiff's parents, specifically concerning the Plaintiff, in the year 2020.

    e. Please confirm whether any of the Plaintiff's records are being withheld based on the application of exemption 7.

3.  The Plaintiff urges the court to expedite the release of FBI FOIA records concerning the deceased Eddie Taw Cheng Kong. This request is made due to the imminent threat to the safety of the involved parties. Additionally, the Plaintiff seeks the court's acceptance of website information and a funeral video as proof of his death.

4.  **Protective relief**:  The Plaintiff seeks protective relief to prevent additional acts of violence, coercion, and tampering of witnesses and evidence.

5.  The FBI, its agents, and confidential human sources are enjoined from retaliating against the Plaintiff, Plaintiff's family, witnesses, suspects, or CHSs involved in this case. For the purposes of this order, retaliation is defined as:

    a.  Physical or financial intimidation or harm.

    b.  Malicious prosecution

    c.  Dissemination of false information.

    d.  Persistent, unwarranted questioning or harassment of the Plaintiff's friends, relatives, legal advisors, employers, or prospective employers.

6.  The FBI, its agents, and confidential human sources are prevented from tampering with or influencing the Plaintiff, witnesses, suspects, and CHSs associated with this case. Specifically, prohibited actions include:

    a.  Coercing or unduly influencing witness and their testimony.

    b.  Sending or influencing emails or other communications under the false pretense of any of the parties involved.

    c.   Prompting or inducing witnesses to communicate or coerce with one another regarding the case.

7.  The FBI is enjoined from coercing, obstructing, or interfering with Department of State (DOS) employees in the provision of government services to the Plaintiff or other parties associated with this case. Prohibited behaviors include, but are not limited to:

    a.   Sending or influencing emails that violate established policies under the pretense of DOS employees.

    b.   Coercing or influencing them to engage in fraudulent activities.

    c.   Interfering with witnesses or foreign investigations related to the Plaintiff.

    d.   Violating the Mutual Legal Assistance Treaty, regarding the Plaintiff.

    e.   Encouraging violations of their own established policies and procedures in reporting and processing allegations of the Plaintiff.

8.  The court is respectfully petitioned to institute protective measures it finds necessary to safeguard the constitutional rights of the involved parties. This is to deter potential violations and prevent irreparable harm, which may arise from concerns over safety, witness tampering, and victim interference.

9.  The FBI and the US Consulate in Brazil are required to respect and adhere to the Mutual Legal Assistance Treaty in the context of the Plaintiff's legal processes in Brazil. Specifically, these entities are prohibited from exerting undue influence or interfering with Brazilian authorities, legal professionals, witnesses, or CHSs associated with the Plaintiff's proceedings. Any unlawful appropriation of the

Plaintiff's private data by these agencies from Brazilian law enforcement is strictly forbidden.

10. The court is urged to issue an order mandating the Defendants to meticulously maintain and safeguard all pertinent records concerning the Plaintiff's claims and related parties. This includes, but is not limited to, FBI files, State Department documents, official correspondence, and electronic communications.

11. Non-compliance with these directives will be construed as contempt of court, potentially resulting in a default judgment in favor of the Plaintiff.

12. As detailed in the accompanying Memorandum of Points and Authorities, the Plaintiff contends their entitlement to relief is driven by the crucial objectives of preserving the integrity of ongoing legal proceedings, ensuring the protection of constitutional rights, and preventing further damage to evidence and potential witness interference.

13. The current circumstances demand immediate court intervention to address and remedy the presented concerns. Without the provision of this preliminary relief, Defendants can continue to engage in tampering or witnesses and evidence without consequences.

14. This motion is reinforced by the Plaintiff's comprehensive Memorandum of Points and Authorities, delineating the legal rationale, and an Affidavit replete with relevant evidence that substantiates the assertions made.

Dated: August 31, 2023

Russell J Terry

6

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

Russell J Terry

Plaintiff,

VS.                                                      CIVIL ACTION NO. _____

The Federal Bureau of Investigation (FBI)

935 Pennsylvania Avenue, N.W.

Washington, D.C., 20535-0001,

Bureau of Consular Affairs (CA)

600 19th Street, NW

Washington, D.C., 20036,

Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**PLAINTIFF'S VERIFIED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**MOTION FOR PRELIMINARY INJUCTION**

The Plaintiff hereby submits this motion for a preliminary injunction based on the following grounds that the Plaintiff submitted an administrative claim to the Federal Bureau of Investigations (FBI) and Bureau of Consular Affairs (CA) on 11/10/2022. The claim was subsequently updated on 04/28/2023, and an additional amendment was received by the FBI

1

on 06/26/2023, providing new facts and evidence. Pursuant to the guidelines outlined in

ADMINISTRATIVE CLAIMS UNDER FEDERAL TORT CLAIMS ACT, Title 28/Chapter I/Part 14.2 item

(c), agencies have six months to rule on a claim after an amendment is received.

The Plaintiff asserts that he satisfies the criteria for a preliminary injunction, specifically: he

demonstrates that he and the investigation will suffer irreparable harm, there is a likelihood of

success on the merits, the balance of equities favors the Plaintiff, the public interest would be

served, and there is no adequate legal remedy available.

In accordance with Local Rule of Civil Procedure 7(m), the Plaintiff has diligently submitted

numerous complaints by means of mail, email, fax and phone calls attempting to pursue justice,

prevent additional irreparable harm, protect himself and other parties involved. Complaints

have been received by the FBI, FBI Inspection Division, Office of Inspector General (OIG),

Department of State OIG, and Bureau of Consular Affairs. The OIG referred the allegations to the

FBI Inspection Division, and the most recent communication received by the Plaintiff was a

letter from the FBI Inspection Division, sent on July 5, 2023, stating they have elected not to

open an investigation.

The Plaintiff respectfully requests the Court to set the bond at zero. The relief sought in this

injunction primarily involves the cessation of specific actions and the compliance with legal

obligations. There is no credible evidence or indication that the adverse party will suffer any

financial harm or damages should the injunction be later dissolved. Furthermore, setting the

bond at zero aligns with the principle of preserving constitutional rights and ensures that no

undue burden is imposed on the Plaintiff in seeking necessary injunctive relief.

**Table of Contents**

Table of Authorities.................................................................................................................4, 5

Preliminary Statement. ......................................................................................................... 6

Facts. ................................................................................................................................... 7

Likelihood of Irreparable Harm ........................................................................................... 40

Probability of Success on the Merits ................................................................................... 41

Balance of Equities ............................................................................................................ 45

Public Interests .................................................................................................................. 45

**Table of Authorities**

18 U.S. Code § 1512 (d) ...............................................................................................29, 35

18 U.S. Code § 1505 – Obstruction of Pending Proceedings...............................................28, 29

Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics 403 U.S. 388 (1971)..42 - 44

FBI Ethics and Integrity Program Policy Directive and Policy Guide 3.1 .................................. 28, 38

FBI Ethics and Integrity Program Policy Directive and Policy Guide 3.2 ..........................10, 11, 38

FBI Ethics and Integrity Program Policy Directive and Policy Guide § 45.11 .......................... 29, 38

FEDERAL BUREAU OF INVESTIGATION LEGAL ATTACHÉ PROGRAM, U.S. Department of Justice

Office of the Inspector General Audit Division, Audit Report 04-18, March 2004, 04-18, page ix,

Coordination with Other U.S. Agencies Overseas

https://oig.justice.gov/sites/default/files/legacy/reports/FBI/a0418/final.pdf .......................... 27

FEDERAL TORT CLAIMS ACT ...................................................................................42, 43

Foreign Affairs Manuel, 7 FAM chapter 060 (c)(3) ...............................................................25

Foreign Affairs Manuel, 7 FAM 113 (d) ..................................................................... 34

Foreign Affairs Manuel, 7 FAM 932.1 ......................................................................... 34

Foreign Affairs Manuel, 7 FAM 965 ......................................................................... 34

*Hong Kong Special Administrative Region v Lee Kwok Wing Kevin, COURT OF APPEAL CRIMINAL

APPEAL NO. 329 OF 2000 .........................................................................................7

* Litif v. United States, 10–1417 (Supreme Court of the United States) ......................................... 30

Mutual Legal Assistance Treaty 12889 USA and Brazil  ...........................................30, 33, 34, 36, 39

Privacy Act of 1974 .................................................................................22, 24, 25, 29, 42 - 44

*Ryan Shane Panzarello vs Joaquim Aires Et. Al ................................................................12

*The Court of Appeal of Singapore, Public Prosecutor v Taw Cheng Kong .....................................7

U.S. Const. Amendment I .............................................................................22, 42 - 44

U.S. Const. Amendment IV ..........................................................................…35 42, 43

U.S. Const. Amendment V ..........................................................................22, 35, 42 - 44

**PRELIMINARY STATEMENT**

1.  The purpose of this motion for a preliminary injunction is to curtail ongoing violence and prevent further irreparable harm by ensuring the Plaintiff's access to complete FOIA records and by restraining and holding the Defendants accountable for obstructing justice. Ongoing stalking and threats, withholding FOIA records and obstruction have not only infringed upon the Plaintiff's constitutional rights but have also compromised the integrity of the ongoing investigation.

2.  The violence that the Plaintiff has been subjected to includes explicit death threats and an attempt on his life, shortly thereafter, the main suspect was suspiciously killed on the same day the Plaintiff filed a police report in Brazil. These threats are believed to originate from a racketeering enterprise involving US federal agents who, in recent years, have used Brazilian police to threaten the Plaintiff and impede investigations.

3.  The irreparable harm inflicted extends to witness tampering and the destruction of crucial evidence through manipulative actions such as data deletion and modification. Additionally, the willful acts of fraud and obstruction by the Defendants, coupled with the decision of the FBI Inspection Division not to initiate an investigation, allow for the continuation of witness tampering, jeopardizing lives, and enabling evidence destruction.

4.  This injunction seeks to address the urgent need for protective measures, evidence preservation, and accountability, thereby safeguarding the Plaintiff's rights and the integrity of the ongoing legal proceedings.

**FACTUAL BACKGROUND**

5.  **The Fraud:** The Plaintiff fell victim to a multi-million-dollar fraud that unfolded over a two-year period within the United States and affected about 20 people. Among the key culprits were Eddie Taw Cheng Kong (Eddie Taw) and Lee Kevin Kwok-wing (Kevin Lee). Prior to their involvement in the scam, both individuals were associated with high-profile cases that include securities fraud, money laundering, and bribery cases in Singapore and Hong Kong.

6.  Eddie Taw, the former Regional Manager (Asia Pacific) of the Government of Singapore Investment Corporation Pte. Ltd., was convicted on eight charges of corruption but later acquitted in the case of The Court of Appeal of Singapore, Public Prosecutor v Taw Cheng Kong. While Kevin Lee was convicted on 17 charges and sentenced to six years in prison in the case of Hong Kong Special Administrative Region v Lee Kwok Wing Kevin, COURT OF APPEAL CRIMINAL APPEAL NO. 329 OF 2000.

7.  What is particularly troubling is the Bureau of Consular Affairs' decision to grant US visas to individuals involved in securities fraud, money laundering, and bribery. Especially Kevin Lee, whom the Plaintiff met in California in the year 2006, which was likely the year he was released from prison.

8.  The Plaintiff was convinced of Eddie and Kevin's legitimacy as wealthy Singaporean business investors, because of they were intelligent, carried themselves well and had a supporting cast of accomplices to build their credibility, especially Eddie's son Christopher Taw and Joaquim Aires (Joe Aires).

9. Joe Aires befriended the Plaintiff by referring him clients around ten months before he was introduced to Eddie Taw.  From the first day he met Joe, Joe spoke of having a close relationship with Eddie and Christopher Taw.  Christopher confirmed their relationship and they claimed to be close friends from college.  Christopher appeared to be the son of a wealthy business investor, Eddie Taw, and spoke about wanting to be a real estate developer.

10. To establish credibility, they went to extreme measures, such as flying the Plaintiff around in a private airplane to look at real estate investments, pairing him with Kevin Lee to analyze multi-million-dollar investments, while being supported by a cast of accomplices that eventually included the Plaintiff's cousin, his friends and pretty women.

11. The Plaintiff was impressed with Eddie Taw and Kevin and persuaded to go into business with them.  Months before initiating their operations, Joe Aires raised suspicions from an FBI agent known to the Plaintiff for over 10 years. The agent indirectly hinted at a potential fraud scheme but failed to provide adequate warning. Based on information and belief, the agent had insight into their activities and may have communicated with his superior. However, due to having recently completed FBI training, he likely lacked the authority to thwart the scheme.

12. Joe Aires, Maria Jose Cumsille and the Plaintiff started a company named Gulfstream, while Eddie Taw and Kevin Lee were going to provide financial support and direction.  A guy who claimed to be Maria Cumsille's fiancé, who will be referred to as SAK, provided all the contacts to make the business work, he also helped Maria hire employees.  As the company made deals, they had obligations to fulfill.  Maria Cumsille and Joe Aires

supposedly wired millions of dollars to Eddie Taw based on promises.  After Eddie Taw

had supposedly tied up the company's funds, the Plaintiff was in a dire financial

situation, struggling to cover the company's immediate expenses.  The accomplices took

advantage of the Plaintiff's urgency to pay expenses by further draining the company's

finances through a series of deceptive tactics.

13. In an effort to address the situation, the Plaintiff, along with Joe Aires, Eddie Taw, and

Eddie's alleged lawyer, met in San Francisco to explore the possibility of Eddie and Kevin

securing the company a line of credit until Eddie returned the funds. During the

meeting, the lawyer was initially calm, then abruptly began scolding Joe for his

arrogance.  As the lawyer's agitation grew, he began shaking his head in apparent

disgust. Eventually, the lawyer, Eddie, and Joe requested time to privately discuss the

deal as he became uncertain about proceeding. Then after a few hours they decided to

move forward with the line of credit.

14. Based on information currently available to the Plaintiff, he now believes the lawyer was

a federal agent due to the fact Eddie Taw, who was supposedly providing the line of

credit with his money barely participated in the conversation, he mainly gazed out the

window with a blank expression on his face.  Furthermore, the line of credit was secured

by both Eddie and Kevin Lee from a bank in the US.  Considering their criminal history

and the fact Kevin had recently been released from prison, its highly unlikely they would

have been able to secure a line of credit.

15. In December 2007, Joe informed the Plaintiff he flew to Macau and Singapore.  It was

reported that Kevin Lee had laundered bribe money in Macau while involved in

9

securities fraud, based off belief there is a strong possibility Joe did the same.  Joe also spent company funds wildly, always collecting receipts as if he were being reimbursed elsewhere.

16. The line of credit allowed Joe to send more money to Eddie, promising a huge return on a supposed initial public offering of Eddie's technology company, which apparently had a prestigious University as a private investor.  Based on belief, the group employed the assistance of a former Los Angeles Laker, to get the Plaintiff to believe he was going to get his former teammates to invest in the business.

17. Around April 2008, Eddie Taw forced the company to repay the line of credit with a fee, without returning the millions of dollars the company had sent to him, which nearly cleaned out the business.

18. Shortly thereafter, the FBI requested information about the business.  The Plaintiff believes they initially tried to entrap him by having a victim of the fraud repeatedly ask him, "What should I tell the FBI?"  The Plaintiff, repeatedly responded, "Tell them the truth."  Thereafter, the Plaintiff responded by email to a series of questions from the FBI and was told the FBI found no wrongdoing.

19. However, given the FBI's involvement, the Plaintiff strongly believes that it's unlikely they were unaware of the millions of dollars sent to Eddie Taw and Kevin Lee, ultimately forcing the Plaintiff to sign his portion of the business over to Joe.

20. The Plaintiff believes that agents overseeing these activities failed to exercise proper oversight and implement preventive measures. Such actions represent a clear violation of the FBI Ethics and Integrity Program and Policy Guide, specifically Policy Directive 3.2

(e), which mandates employees to exert honest effort in the performance of their duties, and Policy Directive 3.2 (h), which requires employees to act impartially and refrain from granting preferential treatment to any private organization or individual.

21. One of the accomplices who worked with Joe to present deceiving credit opportunities, later informed the Plaintiff that he had been in prison on narcotics charges. Based on information and belief, even after 15 years, it appears he continues to engage in the same financial scams.

22. His LinkedIn profile portrays him as a financial expert with endorsements, showcasing a master's degree in finance and past experience as a Portfolio Manager. However, this period overlaps with the time he claimed to be incarcerated. To further validate his credibility, his Instagram profile features him driving a $200,000 Porsche, as shown in Exhibit QQ. Furthermore, he distributed videos prior to the Capitol riots, urging people to be "Ameri-can" rather than "Ameri-can't."

23. These facts strongly suggest an ongoing racketeering enterprise that employs tactics to disguise criminals as reliable financial experts. In 2007, this individual assisted Joe by referring and building the credibility of purported financial experts who deceived the Plaintiff regarding obtaining business credit. Now, it appears he has assumed the role of a disguised financial expert. Even his email address includes the phrase "My turn," giving the impression that he has ascended to a higher position.

24. These racketeers somehow remain shielded from federal investigations, while victims are subjected to threats of death and retaliation for reporting their activities.

25. Based on information and belief, these facts establish a clear motive for FBI agents to impede an investigation of the scheme. This is evidenced by their intentional failure to properly process investigative information, obstruct justice, make of false statements and not to investigate FBI misconduct.

26. **Coercion and Intimidation**: While at the company and after departing it, the Plaintiff received death threats and was often lured into scenarios of attempts to incite violence.

27. About six months after his departure from the company, an associate he met through SAK convinced him to work in South America trading stocks with another apparent financial expert. While in Argentina, several Americans unsuccessfully attempted to persuade the Plaintiff to engage in securities fraud.

28. On September 23, 2011, one of the victims of the fraud filed a civil lawsuit, in the case of Ryan Shane Panzarello vs Joaquim Aires Et Al. Around that time, the Plaintiff started receiving ongoing threatening emails from Morad Abedelal, who identified himself as a US federal agent, indicating he was going to cut him up and get him upon his return to the US. His identity was confirmed by another American.

29. These death threats were followed by a calculated campaign involving defamation, stalking, and orchestrated attacks. Individuals in the Plaintiff's close circle, including friends, associates, and colleagues, were manipulated into taunting, and intimidating the Plaintiff that he was evading the FBI, leading to overwhelming emotional distress and confusion.

30. However, it is worth noting that in 2011, the US Consulate in Brazil had the Plaintiff's passport for approximately two weeks and added 24 pages to it. This raises questions

about the federal agents who were pursuing the Plaintiff. If they were indeed pursuing

him, why did they permit the Consulate to add pages to his passport? The Plaintiff

completed numerous FBI background checks to obtain employment and visas.  Based off

information and belief, the harassment and threats were orchestrated to prevent the

Plaintiff from returning to the US to impede an investigation.

31. Between 2015 and 2017, the Plaintiff relocated to China on a work visa, which had been

approved after an FBI background check. While in China, he worked with a man, who

will be referred as FL. Although the Plaintiff did not disclose information about his life, FL

continuously made sarcastic remarks about people who were involved in the fraud,

death threats and physical attacks.  Allowing the Plaintiff to realize these events were

connected and he was aware of them.

32. FL made it clear the women he dated and the locals he associated with would do

anything for a US visa.  He made sarcastic remarks about Americans who had befriended

him, especially one who will be referred as CG.  The Plaintiff met CG in Argentina when

he was getting death threats from Morad, CG stayed in Argentina about three years and

left on almost the same day as the Plaintiff.  FL reenacted the time the Plaintiff was

attacked by a guy CG invited to play pool with them, then implied the Plaintiff was too

pussy to fight back.  He also reenacted other attacks and made sarcastic remarks,

helping the Plaintiff to realize they were arranged and have been ongoing since 2008.

The Plaintiff understood there was a coordinated effort among US agents and that it was

not safe to return to the US.

33. As a result, in 2017, he moved to Brazil and got married to a woman he believed was connected to US Federal agents. He hoped this might ease the pressure and harassment he was facing. However, just the opposite was true.  Based off information and belief, US federal agents informed Brazilian police he was running from the FBI and extorted his money through the marriage.

34. They sent him emails in English, pretending to be his wife, and obligating him to send her money, as shown in Exhibit A. He felt forced to do so because he was constantly being followed and threatened. From 2017 to 2018, most of these men sent to intimidate him were from Curitiba, where the FBI was known to be investigating the Lava Jato case. Wherever the Plaintiff stayed, housemates and associates implied be was running from US authorities.  These events matched the earlier pattern of stalking, disseminating false information and inciting violence that started in 2008 and got worse in 2011 after Morad's death threats and the civil lawsuit that was filed by Ryan Panzarello.

35. The Plaintiff believes his ex-wife may have been compensated by a third party to marry him and participate in the harassment.  The day they got married she registered a business.  Emails the Plaintiff received from her made claims she was suffering from cancer and needed money, however when they were getting a divorce, she let him know she was buying a house.  On February 18, 2022, when the Plaintiff petitioned a Brazilian judge of stalking by US federal agents in court process 1518500-55.2021.8.26.0050, Barra Funda, Sao Paulo and included information about Camila's business, public records show the business was closed one month later, Exhibit B.

36. **Acts of violence that have caused irreparable harm**: In 2018, a friend of the Plaintiff's from China began accusing him of running from the FBI on chat messages. When the Plaintiff made a comment about their former colleague FL, the very next day the men who were following the Plaintiff became very aggressive and continually tried to start fights with him over the next couple of months, which prompted the Plaintiff to begin reporting the incidents to the FBI.

37. Upon reporting FBI misconduct, retaliation often commenced the following day and could persist for several months. This retaliation encompassed various forms, including threats to personal safety, disruption of employment and education, and the harassment of friends and family.

38. In the year 2020, after numerous complaints to the FBI and the only response he received was retaliation, the Plaintiff tried to pick up more evidence to include in his complaints.  First, he reached out to CG to see if he would reveal any information via chat. CG asked him why he was not using his email account, which was the email account the Plaintiff received death threats.  The Plaintiff had been blocked out of that account when he went to China.  CG asked him, "Who is after you," implying the Plaintiff was being stalked, and he wrote the email account in Skype, were the death threats were received.  Since the Plaintiff gained suspicion from FL that CG was involved with the federal agents that threatened him, he hoped that by linking CG to the email account, would prove the email account was being monitored, Exhibit  PP.

39. Next the Plaintiff sought to gather information about Eddie Taw, however, since he was being closely followed by Brazilians and one American, who is believed to have been an

agent because of on his aggressive nature, he decided to wait until he moved to a new

town before conducting research to include in his next complaint.

40. In December 2020, the Plaintiff relocated to Blumenau, Brazil, and began his

investigation. At the end of the week, on December 20th, the man who had stayed in the

adjacent room at the Plaintiff's previous hotel suddenly appeared at his hotel in

Blumenau. The Plaintiff had previously suspected he was surveilling him, and the man

greeted him by saying, "it's a small world."

41. That day, due to Covid restrictions, almost everything in town was closed, and the

streets were empty as it was close to Christmas. The Plaintiff could only find lunch at a

supermarket. As he sat down to eat in an empty food court, an unknown man

aggressively approached him, taking pictures and making threatening gestures as if he

was about to attack. The man continued to glare at the Plaintiff with aggression

throughout his lunch.

42. Although being followed by individuals attempting to incite violence had become a

regular occurrence for the Plaintiff since he began reporting FBI misconduct, this man's

facial expressions and body language were much more aggressive.

43. After finishing lunch, the Plaintiff walked across town back to his hotel and only saw

perhaps three cars on the road.  As he entered a cross walk, a black chevy pickup truck

came from behind him and accelerated into the crosswalk attempting to side swipe him

with the vehicle.  The Plaintiff was shaken up, and suddenly realized the attempt must

have been because he was searching for information about Eddie Taw.

16

44. For the remaining few weeks, that the Plaintiff stayed at the hotel, the man who the Plaintiff suspected was a surveilling him, would wait in the lobby every time the Plaintiff left the hotel making eye contact with him when he returned.

45. Additionally, other men followed the Plaintiff around town, making comments as they passed him, to let him know he was being followed. One of his Portuguese tutors asked questions and made comments during their lessons to indicate he was aware of items he had purchased and money he was withdrawing from his bank account.

46. When the Plaintiff's company returned back to work from a holiday break, his work managers belittled and fired him from his job.

47. In February 2021 the DOJ Civil Rights Division began to analyze the Plaintiff's complaint of FBI misconduct, shown in Exhibit C.  The Civil Rights division emailed the Plaintiff stating they would have an inspector contact him; however, the Plaintiff was never contacted.  It's important to note that over the course of four years from 2019 - 2023, the Plaintiff has lodged several complaints with various departments within the DOJ. Among these, only the Civil Rights Division provided a response, assigning a complaint number and informing the Plaintiff they would be in contact, indicating that someone within the DOJ had read and taken the complaint seriously.

48. The Plaintiff made multiple attempts to contact someone at the DOJ after receiving the email, shown in Exhibit D.  In one attempt, a woman at the DOJ said, well you are out of the country, however the Plaintiff was calling from an American Skype number, so the only way she could have known he was out of the country is if an unknown source told her.   She transferred him to someone who was supposedly in Argentina.  The Plaintiff

began explaining his situation to the man, then the man told him to hang on because he would have to transfer him.  After that he disconnected the phone. Thereafter, the Plaintiff was only able to leave voicemails at the DOJ, but never got in touch with anyone.

49. Two years later, the Plaintiff was informed through a FOIA request, "Please note, the allegations presented in your complaint are not in the Civil Rights Division's purview.  You may wish to contact a private attorney for help with your concerns or consult a law library."  This response contradicts the actions taken by the Division.  If the allegations were not in their purview, they would not have assigned an ID number, emailed the Plaintiff and had the complaint open for two years, as shown on Exhibit C.

50. The Plaintiff also sought legal assistance in Brazil, as shown in Exhibit E, lawyers suggested he go to the police and seek protection.

51. At that time, a couple of his Portuguese tutors, who based upon information and belief were confidential human sources (CHS)s, continuously asked the Plaintiff questions about the Proud Boys.  Therefore, the Plaintiff began to read recent information about their involvement in the Capitol Riots and their leader.  The Plaintiff was stunned to realize the similarities among the Proud Boy's leader Enrique Tarro, Eddie Taw and Joe Aires; they were criminals who could have been prosecuted, they led their respective groups for 2-years, they were assisted by others who enhanced their credibility, they gave people high hopes, brought out the worst in the people they led and when the big day came for the Proud Boys, Enrique disappeared as did Eddie Taw and Joe Aires.

52. Before class, the Plaintiff was in a state of shock and disbelief, feeling as if he may have

been set up by FBI agents and CHSs over the course of two years.  When his teacher

connected to the lesson, she said, I want to ask you some questions before class, she

asked, "what is something that has taken you a long time to realize?" The Plaintiff

responded, "I was robbed." She asked, "In Brazil?"  Plaintiff said, "No, in the US."  Her

next question was, "What is something that you most want to do?"  Plaintiff responded,

"Get those corrupt bandits." She said, well you are in Brazil now, you can stay here are

enjoy Brazil.  The timing of her questions and the response about staying in Brazil, which

was a similar response given by his ex-wife after he informed her, he was being

threatened by US federal agents, gave him a higher level of certainty that he may have

been set up by CHSs and federal agents.

53. On April 17, 2021, the day the Plaintiff made a police report in Brazil regarding the

stalking and attempt to run him over, Exhibit F.  That same day, according to the

amazinggracefunerals.com website and a youtube.com video, Eddie Taw Cheng Kong

was killed, Exhibit G.

54. When the Plaintiff initially saw that Eddie Taw had died, it was one of the first things that

popped up on Google and Bing when searching for "Taw Cheng Kong." The Plaintiff did

not watch the entire funeral but suspected that Eddie Taw had not actually died. He

believed that his death was being faked to avoid him being interrogated, as he

supposedly died on the same day the Plaintiff made a police report in Brazil.

Furthermore, Eddie Taw's funeral did not take place until eighteen days after his

reported death, while others on the website had funerals within four days of their

passing. Consequently, the Plaintiff downloaded information from the website and the funeral video, suspecting that it might disappear.

55. However, in 2022, when the Plaintiff sought assistance from Brazilian legal and medical professionals without mentioning Eddie Taw's supposed death, they informed the Plaintiff in Portuguese that this was a "queima de arquivo," which translates to "burning a file" and they referred to the Plaintiff as a "moving file" that they wanted to get. The Plaintiff assumed, "burning a file" meant the destruction of evidence, such as documents or emails. After repeatedly hearing this expression, the legal professionals began acting in bad faith, deliberately making false statements, failing to petition the court and neglecting to present court allegations in the Plaintiff's best interests. When the Plaintiff finally looked up the expression, he discovered that it referred to the act of murdering someone who possesses too much information. Upon revisiting the amazinggracefunerals.com website, after the FBI Inspection Division reviewed the allegations, Eddie Taw's information had been deleted, Exhibit H. Moreover, the information about Eddie Taw's funeral, which was previously found on Google and Bing search engines in 2021 and 2022, can no longer be found.

56. Eulogies at Eddie's funeral revealed that his death was unexpected. Based off the eulogies given, Eddie had not communicated with his family prior to his death but had been in touch with his business associate. His daughter mentioned that they used to speak every other day, and he would send her religious scriptures, but she did not have a chance to say goodbye. In his last conversation with his business partner, Eddie told him he was okay and for him to pray.

57. On May 12, 2021, the Plaintiff made another report with the DOJ, Office of Professional Responsibility, Exhibit I. Just one week later, he was subjected to a drug-induced robbery, specifically targeting his laptops and cellular devices, which contained vital communications with individuals, including possible US informants and agents.

58. One of the laptops, was brought from a friend in the United States in 2014.  The same laptop the Plaintiff's coworker from China, FL hinted they were using to spy on him. Notably, after the Plaintiff was drugged, the suspect was in his apartment for over an hour and did not touch his wallet or take other items of value, however the email he received from the DOJ Civil Rights was deleted.

59. Upon the suspect's identification by the Brazilian Civil Police, the Plaintiff informed them of her involvement in the persecution being carried out by US federal agents. Also, that an agent had previously threatened to murder him and there was an attempt to run him over five months prior. Furthermore, the suspect only sought to destroy evidence he stored in his laptops, which was retaliation for reporting FBI misconduct.

60. Subsequently, a police officer accessed his phone and spent five minutes reading its contents. Following this, he began to threaten the Plaintiff using information that only the FBI or CIA would have possessed. He emphasized that they were engaging in harassment against his mother in the US and told him not to return to the police station.

61. Recognizing that the police would not provide an opportunity for him to fully present his allegations, the Plaintiff filed a separate police report (#1060148/2021) on June 15, 2021, Exhibit K. Despite this effort, when the suspect was captured on June 30, the police declined to include his claims of FBI involvement in the final report.

21

62. During the hearing of the robbery, numerous serious irregularities emerged. The recording of the Plaintiff's testimony was abruptly cut off as he began to testify about being threatened at the police station. Additionally, he was denied access to investigative documents. Police officer, Luvio Barros falsely testified as to which officers were involved in the investigation, lied about having spoken with the Plaintiff and asserted that the Plaintiff had never mentioned FBI involvement. Notably, when the defendant was called to testify, there was a woman seated beside her whose identity was inexplicably absent from the court records.

63. Due to the fact US and Brazilian authorities have not opened up an investigation, the only way the Plaintiff can defend himself is to access to FOIA records and seek protective orders from the court.

64. **Retaliation / Suppression of First, Fourth and Fifth Amendment Rights /Violation of the Privacy Act.**: Another form of retaliation was in the form of harassment to suppress the Plaintiff's first amendment rights.  The Plaintiff believes that the FBI influenced US Consulate employees to aid in harassing his family and obstructing justice as retaliation for reporting FBI misconduct and to impede an investigation.

65. During Zoom calls in the year 2020, the Plaintiff witnessed firsthand the fear, anger, and frustration displayed by his family members, emotions he had never seen them display before. These incidents occurred immediately after the Plaintiff sent E-Tips to the FBI or discussed incidents of harassment from federal agents with his family.

66. On September 20, 2020, the Plaintiff informed his mother of ceasing contact with the family to protect them from harassment. In response, he received a series of suspicious

emails from his mother's email account.  Based off information and belief they were not written by his mother, and they were sent with the intent to inflict emotional distress upon the Plaintiff and his family.

67. The first three emails were completely unrelated to the Plaintiff mentioning he was going to stop communicating with the family because they were being harassed, Exhibit L.  The Plaintiff did not respond to those emails.

68. The fourth email informed the Plaintiff to keep in touch once a month, then ridiculed his mother's ability to use a computer and be a good mother, Exhibit M.  The Plaintiff responded to the email disputing the comment that she was not a good mother.

69. It's important to note, that none of the emails disputed the Plaintiff's claim that his family was being harassed, instead they ridiculed his elderly mother who had a brain tumor removed which has caused her serious health issues.

70. The next day, on September 23rd, he received a "blame the victim" type email written by someone with in-depth knowledge of how the Plaintiff was lured into the fraud with Eddie Taw.  The Plaintiff believes the person who wrote the email has knowledge of how the Plaintiff was set up and why he is in a bad situation, also in Exhibit M.

71. In none of the emails did it mention concern for the Plaintiff's whereabouts or dispute the family being harassed.

72. Five days later, on September 28, 2020, and September 30, Teresa Seabra, a US Consular Assistant with American Citizen Services in Sao Paulo, Brazil, initiated email communication with the Plaintiff, claiming that his parents were concerned about his well-being and whereabouts, Exhibit N.

73. The Plaintiff did not respond to Teresa's emails, but received other emails from his mother, none of which stated they contacted the US Consulate or were concerned with his whereabouts, for example an email on Christmas, Exhibit O.

74.  A subsequent email was received from Teresa on and January 15, 2021, Exhibit P.  Her emails inflicted emotional distress upon the Plaintiff, knowing that if he contacted his family, they would be subject to harassment.

75. However, when the Plaintiff emailed American Citizen Services on June 17, 2021, after the robbery, seeking protection and assistance, American Citizen Services initially delayed in responding to him.  Six days later, on June 23rd, Consular Assistant Liliana Cruz from American Citizen Services in Sao Paulo, compelled him to complete the Privacy Act Waiver form and answer personal questions before the US Consulate would assist him. Liliana wrote in her email, "Before we try to help you, we need you to please fill out both sides of the attached Privacy Act Waiver form, sign it and send back to us." Implying without filling out the form he could not get assistance from the US Consulate, Exhibit Q.

76. The form clearly states, "The U.S. Government, by providing the Authorization for the Release of Information Under the Privacy Act Form, cannot under any circumstances compel an individual to complete and submit the form."  The Plaintiff was compelled to complete the form to get assistance for his urgent matter.

77. After completing the form, Liliana Cruz falsely informed him that they were unable to assist him or put him in direct contact with the FBI attaché.  Even after obtaining all his personal information, she made no mention of his parents being concerned for his whereabouts and wellbeing.

78. About a month later, Teresa, who works in the same office as Liliana, continued the charade by asserting that American Citizen Services at the US Consulate was still searching for the Plaintiff based on his parents' request, Exhibit R.

79. On March 9, 2022, the Plaintiff requested Teresa to verify the identity of those searching for him, referring to the emails sent on September 28, 2020, September 30, 2020, January 15, 2021, and July 16, 2021. However, Teresa's response was not truthful; she stated that she could not share correspondence from his parents and ceased responding when he asked to confirm their names, Exhibit S.

80. Based on the Privacy Act, the only way she could have informed the Plaintiff his parents were looking for him, is if they completed the Privacy Act Waiver.  The Privacy Act of 1974 (5 U.S.C. 552a; Public Law 93-579) prohibits consular officers from releasing any "record" about an individual U.S. citizen from their system of records without the prior written consent of the individual in question or an applicable exception. This rule is also included in the Foreign Affairs Manuel, 7 FAM chapter 060 (c)(3) Privacy Act guidance.

81. The fact that she informed the Plaintiff his parents were searching for him means American Citizen Services should have had their written consent, therefore she could have shared their email correspondence and most certainly their names.

82. Given the circumstances described above, the Plaintiff started questioning the credibility of American Citizen Services (ACS) assertions regarding contact with his parents, the Privacy Act and not being able to get the Plaintiff in contact with someone from the FBI attaché.

83. On April 2, 2023, Teresa proved that Liliana made false statements about ACS not being about to put him in contact with the FBI attaché, by directing the Plaintiff to the FBI Attache in Brasilia to report the crimes, Exhibit T.

84. Based on the available information and belief, it strongly appears that the FBI influenced a pattern of harassment and violations of the Plaintiff's liberties to impede an investigation involving Eddie Taw, not only by utilizing US Consular Assistants but also by enlisting the assistance of job recruiters.

85. The week after the Plaintiff testified in Brazilian court that the FBI contracted the defendant to drug and rob him, on September 15, 2021, the Plaintiff was contacted by a recruiter, from Apex Systems, who presented a remote job opportunity with AT&T / DirecTV. The Plaintiff diligently completed assignments and participated in an interview for the position over a two-week period. However, throughout the interview process, several strange occurrences were evident. The job requirements changed unexpectedly, with the team lead expressing a need for different skills than those initially stated in the job description. Additionally, the Plaintiff was repeatedly asked to complete multiple additional tasks in the take-home assignment, which the team lead continuously updated, leading to doubts about the authenticity of the process.

86. Furthermore, on October 1st, the recruiter informed the Plaintiff that despite the job being remote, he needed to be located within the United States to fulfill the role. Strangely, even though the Plaintiff did not complete any paperwork to accept the position, the recruiter claimed that AT&T sent a laptop to the Plaintiff's parents' home without requiring a signature, a highly irregular practice for a reputable company.

Subsequently, two Apex recruiters and an AT&T employee played helpless as if they could not stop the delivery of the laptop or send FedEx to pick up the laptop where they left it.  Instead, all three of them pressured the Plaintiff to contact his mother.  After they supposedly contacted his mother, they made claims that she had opened the package and was confused.  They claimed he had to reach out to her so they could email her a shipping label.

87. Given the inconsistencies and manipulative tactics employed throughout the process, it is evident that the job offer extended to the Plaintiff was not genuine, the Plaintiff believes the goal was to put him in fear that he would not be able to get a job and his family would be harassed for reporting FBI misconduct.

88. Additionally, it is worth noting that the Plaintiff had previously lodged complaints regarding interference with his employment and education. Colleagues and classmates ridiculed him of evading the FBI, which damaged his relationships and hindered his progress. Furthermore, his managers engaged in tactics to confuse and belittle him, ultimately resulting in the loss of his job.

89. **FBI Obstruction of Justice**: When the Plaintiff initially contacted the American Citizen Services at the US Consulate to establish communication with the FBI attaché, false statements in emails from Liliana Cruz hindered the Plaintiff's ability to directly reach the FBI attaché in Brazil.

90. According to the FBI LEGAL ATTACHÉ PROGRAM audit report, "Legal Attaché personnel are considered part of the U.S. Embassy staff, and the Legal Attaché office is physically located on the premises of a U.S. Embassy. As part of their duties, FBI Legal Attachés

often need to interact with Ambassadors and their staff." These misleading statements not only caused delays but also obstructed the Plaintiff from directly approaching the FBI. Given that American Citizen Services and Liliana were aware of the DOJ's ongoing examination of his complaints, this constitutes obstruction of justice under 18 U.S. Code § 1505. Based on information and belief, it is highly improbable that Consular Assistants would contravene these policies without higher authorities' guidance.

91. On November 4, 2021, the Plaintiff once again contacted American Citizen Services to connect with the FBI attaché and was linked with Rodolfo Paredes, an FBI Investigator at the FBI attaché in Brazil.

92. On November 8, the Plaintiff provided Rodolfo with a comprehensive account of events, spanning from the U.S. fraud to the recent robbery. The Plaintiff inquired about the appropriate FBI department for investigation and whether he should involve the Brazilian Federal Police.

93. On November 10th, in response, Rodolfo directed the Plaintiff to report the allegations to the Brazilian Civil Police, as shown in Exhibit U he said, "I have read and seen all of the documents you have sent.  Unfortunately, we do not have the capability nor the jurisdiction to conduct investigations in the US nor in Brazil. We basically work on liaising and providing guidance to central authorities that will conduct investigations, in other words, we do not have authority for that." This guidance contradicted the FBI legal attaché office's stipulated responsibilities on the FBI's official website, which include conducting investigations, sharing leads, and facilitating victim assistance.  In accordance with the FBI's Ethics and Integrity Program Policy Directive and Policy Guide 3.1 (5),

agents are required to report any violations of law or regulations committed by

themselves or others to the relevant authorities.

94. However, upon receiving FBI records through a FOIA/Privacy Act request, in contrast to

Rodolfo's emails suggesting the FBI attaché's inability to assist him, on November 11, he

created a detailed FBI record of the Plaintiff's complaint, shown in Exhibit V,

encompassing offenses such as "Corruption, emailed death threats, robbery, attempted

murder, defamation, destruction of evidence, fraud, and entrapment." This summary

provided a comprehensive overview of the Plaintiff's report. Based on the report it

appears that Rodolfo genuinely intended to fulfill his responsibilities, however, the

complaint was swiftly reviewed and closed by the Miami Field office within a little over

two hours.

95. Per the FBI's Ethics and Integrity Program Policy Directive and Policy Guide § 45.11, the

appropriate course of action would have been to refer the complaint to the Office of

Inspector General (OIG) for a thorough investigation and necessary action.

96. On November 27, the Plaintiff being confused, asked Rodolfo which agency to report the

crimes that occurred in the United States.  Rodolfo responded to report the crimes to

the police both in Brazil and in the US.

97. Rodolfo's email communications stand in stark contrast to his subsequent actions and

established FBI protocols. These emails uncover fraudulent behavior and obstruction of

justice, transgressing both 18 U.S. Code § 1505 and 18 U.S. Code § 1512.

98. It is exceedingly unlikely that an FBI agent who meticulously summarized such grave

allegations, commencing with the term "Corruption," would subsequently engage in

deceptive and obstructive email exchanges. The fact it was not reported to the OIG and the rapid closure of the case by the Miami Field Office, in conjunction with these inconsistencies, hints at the potential influence of higher authorities guiding Rodolfo's email responses. This recurring pattern is also discernible in the conduct of US Consular assistants Teresa Seabra and Liliana Cruz, whom based off belief were directed by higher authorities to violate polices.

99. As a result of Rodolfo's guidance to report incidents at their place of occurrence, on December 9, 2021, the Plaintiff took the initiative to forward the entire email exchange with Rodolfo to the Los Angeles FBI, the place where everything started, via the email address pctips-losangeles@fbi.gov.

100.    In response, the Plaintiff received a confirmation, see Exhibit W, "Your message will be reviewed for further actions as appropriate." However, despite this initial communication, there was no subsequent follow-up from the Los Angeles FBI. Since they were forwarded the email chain, they should have had access to all the documents and saw Rodolfo's guidance to report the incidents where they occurred. The Plaintiff's FOIA response does not show any E-tips from the Los Angeles FBI.

101.    As in the case of Litif v. United States, where FBI agents sheltered a conspiracy for decades, and there was nothing to connect the agents to the crimes committed.  This is the Plaintiff's first piece of evidence demonstrating the FBI shielding an investigation of corruption surrounding Eddie Taw Cheng Kong.

102.    **Tampering with witnesses / Interference with Brazilian Police / Violations of the Mutual Legal Assistance Treaty:** On June 3, 2022, the Plaintiff sent a complaint to the

Office of Inspector General (OIG). The Plaintiff had recently reestablished contact with his father to assist him in finding a lawyer. Upon confirmation from his father's email address on June 4, the Plaintiff provided the complaint, with the intent to seek legal assistance.

103.      The Plaintiff spoke with his father and received emails referencing the witnesses, Exhibit X.  Based on information and belief, John and Jane Doe FBI agents tampered with the Plaintiff's father to request and access the complaint, then sent emails to coerce the Plaintiff to get in contact with witnesses.

104.      The Plaintiff also received an email from his father's email account, with a picture of the Brazilian witness, then claimed he had been in contact with her over the past two years and she was searching for the Plaintiff.  However, contrary to that statement, he had never sent the Plaintiff an email or mentioned her until the Plaintiff sent the complaint.

105.      This resembles the same tactic used with US Consular Assistants, who made suspicious claims that the Plaintiff's parents had contacted the Consulate concerned about his whereabouts, while the Plaintiff never received any communication from his parents stating they had contacted the Consulate or were concerned for his whereabouts.

106.      The OIG responded to the Plaintiff, notifying him that his allegations would be reviewed by the FBI Inspection Division, Exhibit Z.  Additionally, in July 2022, the Plaintiff filed a complaint with the Federal Prosecutor in Brazil. As a result, both US and Brazilian authorities were examining his complaints.

107.     After making a FOIA request for FBI records, the FBI Inspection Division informed

the Plaintiff that they carefully reviewed the complaint and although an Internal Affairs

investigation was not initiated, they mandated action to address the concerns raised in

the complaint, Exhibit AA.

108.     The Plaintiff's topmost concern revolves around the abuse of power that has not

only jeopardized his personal safety but also the safety and well-being of others

involved. The FBI's choice not to initiate an investigation after enduring fifteen years of

deception, threats, and violent harassment from a racketeering enterprise that seems to

have connections with federal agents is extremely difficult to accept. This decision

permits the ongoing operation of this racketeering enterprise, posing a continual threat

to his safety and society at large.

109.     Even worse, within two months of the FBI Inspection Division receiving the

allegations, US Consulate personnel and the Civil police in Brazil participated in the most

blatant acts of obstruction of justice to tamper with Brazilian and American witnesses.

110.     On Aug 6 – 7, 2022 the Plaintiff received 10 calls and messages from the Brazilian

witness, that will be referred to as MM.  MM was mentioned in the report to the OIG

and Brazilian Federal Prosecutor.  However, MM did not have the Plaintiff's phone

number, and they had not spoken for 2-years, Exhibit BB(a).

111.     The Plaintiff made police report 1.422/2022-5, Exhibit BB(b), with the Brazilian

Civil Police.  Notifying them that the messages the Plaintiff received were likely sent

from FBI agents attempting to tamper with the Plaintiff and MM.  The Plaintiff included

evidence that MM was listed as a witness on police report 1060148/2021.

112.     On August 9,2022, the Civil police forwarded police reports 1.422/2022-5, 1060148/2021 and evidence submitted by the Plaintiff to the US Ambassador making them aware of the Plaintiff's allegations and telling them to take legal action, Exhibit BB(c).  Which is a violation of the Mutual Legal Assistance Treaty (MLAT) and data privacy laws in Brazil.

113.     That same day, the Plaintiff received three messages from MM.  The first message shown in Exhibit BB(a) item 11, shows police report 1060148/2021, typed out in its entirety, followed by a denial of the allegations and the third message confirms MM received the police report.  The message of the police report matches word of word the police report shown in Exhibit BB(d).  He also received an email from Monaliza, Exhibit BB(e) saying she received the police report.

114.     On August 17, the Civil police again forwarded the US Ambassador the updated allegations, requesting they take legal action, Exhibit BB(f).

115.     On August 24, the Civil police informed the Plaintiff they sent all the documents in his file to the US Consulate and that the Consulate would take investigate action. The Civil Police also informed the Plaintiff that the Consulate has an internal division to decide if the allegations should be investigated by the Brazilian police, Exhibit BB(g).

116.     Therefore, the Plaintiff engaged in email correspondence with American Citizen Services (ACS) at the US Consulate to determine the whereabouts of the police report and the subsequent course of action, shown in Exhibits BB(i) and CC. During this exchange, ACS requested specific details of the police report, informing that they could

take legal action. However, these requests are in violation of the MLAT and Foreign

Affairs Manual (FAM) policies 7 FAM 932.1 and 965.

117.     7 FAM 932.1 Urgent Need for Evidence (b) states, In no case should a consular

officer obtain documentary evidence (corporate or bank records, for example) in a civil

or criminal case, when such requests are made by private persons or do not come

through the usual channels of the host country judicial system. If a request comes from

outside the Department, consult CA/OCS before providing assistance for clarification of

the propriety and validity of the request."

118.     7 FAM 965, which states, "Consular officers should provide assistance to U.S.,

State, and local government agencies in judicial assistance matters, bearing in mind the

need to observe host country legal procedures and sensitivities, as well as any

limitations prescribed by U.S. law or policy."

119.     The Plaintiff did not provide any details of the police report and requested to

know the identity of the person with whom he was corresponding at American Citizen

Services.  However, they refused to provide such information, citing it was against policy.

This refusal constitutes yet another violation of the Foreign Affairs Manual (FAM),

specifically 7 FAM 113 (d) and (e), which clearly stipulates that consular assistants must

always be prepared to identify themselves by name and title when engaging in

conversations with U.S. citizens/nationals regarding American Citizen Services (ACS)

issues.

120.     Additionally, when the Plaintiff sought a means to communicate with the US

Ambassador and requested her email address, he was informed they were not

authorized to disclose such information. Despite the Plaintiff's subsequent request for an

alternative method of communication, the attendant inexplicably ceased responding,

leaving the Plaintiff without a proper avenue to address his concerns or seek assistance.

121.    The Plaintiff inquired with the Brazilian Civil Police if it was possible MM received

police report 1060148/2021 from the Brazilian police, Exhibit BB(h).  The police stated

there was no way MM could have gotten it from the Civil police because the report was

not validated.  Even if the police had searched for police reports involving MM, they

would not have been able to locate that report.

122.    Aside from that, based upon data protection laws in Brazil, the police did not

have the authority to give MM the police report because it did not include MM's

Brazilian id number, or last name.

123.    Therefore, based off information and belief, the only way MM could have gotten

the Police report was from the US Consulate who received it from the Civil Police.  And

the only party in the US Consulate with a motive to tamper with the witness was the FBI,

because the allegations were against them.

124.    These acts constitute violations of the Fourth amendment, illegal seizure of

private information, the Fifth amendment, deprivation of the Plaintiff's property interest

without due process of law and 18 U.S. Code § 1512 tampering with a victim, witness, or

informant.

125.    This marks the second time there has been interference and irregularities with

Brazilian Police relating to police report 1060148/2021.

126.     The Plaintiff received an official response from the Regional Civil Police, shown in

Exhibit DD, that the Civil Police do not have the authority to send investigative

information to the US Consulate.  Investigative information going to US authorities

should be sent through the Central Authority and respect the Mutual Legal Assistance

Treaty (MLAT), in Brazil the MLAT equivalent is Decree 3.810.

127.     Due to the fact the Plaintiff was unable to get assistance from any American or

Brazilian authorities, in March and April 2023 – Plaintiff makes attempts to send

correspondence to the US Ambassador.  However, ACS from Sao Paulo would not allow

information to reach the US Ambassador and directed the Plaintiff to mail allegations to

the FBI attaché in Brasilia, shown on Exhibit T.  ACS from Brasilia responded with another

false statement, "As mentioned before, we are not allowed to share any contact

information or forward letter to the ambassador", shown in Exhibit EE.

128.     Therefore, the Plaintiff sent an overview of his complaint to the FBI and Consular

Assistants, requesting they follow their policies and report the policy violations to the

appropriate channels, Exhibit FF.  The Plaintiff did not receive any confirmation that they

would report the incidents.

129.     These actions show deliberate acts of obstruction of justice and suppression of

amendment rights.

130.     **Tampering with Evidence**: Following the review of allegations by the FBI

Inspection Division, evidence included in the allegations was manipulated. Information

about Eddie Taw's death was removed from the amazinggracefunerals.com website.

Wall posts from Maria Jose Cumsille's Facebook account dating back to 2008 were

suddenly deleted, seen in Exhibit GG. Data from the Lingofor.me website appeared to be altered shown in Exhibit HH.   Also, one of the videos of the accomplice motivating people before the Capitol riots to be an Ameri-can not an Ameri-can't was removed.

131.     Moreover, the business opened by the Plaintiff's ex-wife on the day they married, was closed a month after the Plaintiff reported it as possibly being used to disguise payments from a third party.   The Plaintiff had previous lost access to his Facebook, Skype history, and the email accounts containing death threats.

132.     However, since police officers in Brazil and the Plaintiff's associates informed him that he was running from the FBI, the FBI must have been monitoring his email account which is why the Plaintiff urgently needs access to his complete FOIA records.

133.     **FBI Call Center**:  The Plaintiff made multiple unsuccessful attempts to report FBI misconduct to the FBI Call Center.  All call center agents, responded to the Plaintiff's allegations in a dismissive or misleading manner. In all instances, he was rushed off the phone after reporting FBI misconduct, leading him to believe there is a concerted effort instructed by higher authorities.

134.     The Plaintiff made two phone calls on 12/13/2021, due to the fact of being rushed off the phone he sent an E-tip on 12/15.  On 5/27/2022 from 6:48 to 7:08 the Plaintiff made three calls to the FBI Call Center because they continued to rush him off the phone.  During the last two calls, when agents answered, they abruptly placed him on hold, possibly an interruption by a supervisor. During the second call they requested his phone number and information where he lives, the Plaintiff provides him all the information requested, then when he tries to report the crimes, the agent says, "not this

again," and rushes him off the phone. On the last call, when the Plaintiff expressed concerns about his parents facing harassment due to FBI retaliation, the agent responded dismissively with "yeah right" then rushed him off the phone.

135.    Furthermore, since the reports are of FBI misconduct, per FBI's Ethics and Integrity Program Policy Directive and Policy Guide § 45.11, they should have been reported to the OIG.  The reports show they were closed within a couple of hours, Calls and E-tips are shown in Exhibit II.  These interactions serve as evidence of a concerted effort to obstruct reports of FBI misconduct from reaching the appropriate department, violating FBI Ethics and Integrity Program Policy Directive and Policy Guide 3.1 (5) which states, "Report to the proper authority any violations of law and regulation by themselves or others," and 3.2 (e) which states, "Employees shall put forth an honest effort in the performance of their duties."

136.    **Lack of Transparency: Incomplete records in response to FOIA Requests:** Records provided in the Freedom of Information Access requests have fallen short of providing the expected comprehensive information required by FOIA requests.

137.    **FBI Personal Records:** In the initial request (#1583131-000) for his FBI personal records, Exhibit JJ, the agency responded on February 23, 2023, that they found no information about the Plaintiff in their Central Records System.

138.    However, in the subsequent request (#1585662-000), Exhibit KK on June 23, the Plaintiff received 56 pages of records, which only included some records going back to 11/11/2021.

139.      However, the Plaintiff E-tips go back to at least 2019. The E-tips lack details and

do not include any allegations of the suspected homicide of Eddie Taw Cheng Kong as a

result of reporting FBI misconduct, witness tampering and violations of the Mutual Legal

Assistance Treaty.

140.      Additionally, no records were sent regarding the company they investigated in

May 2008, in which the Plaintiff was an officer, called Gulfstream.

141.      There were also no records provided in which the Plaintiff believes they

intimidated his family after submitting complaints of FBI misconduct in the year 2020,

nor did they inform him that records were being withheld based upon exemption 7.

142.      The FBI has wrongfully withheld the requested records from the Plaintiff.

143.      **FBI Eddie Taw:** Exhibit LL shows correspondence of the Plaintiff's FOIA request for

Eddie Taw Cheng Kong.  The Plaintiff made a FOIA request for records pertaining to Eddie

Taw Cheng Kong, request 1600256-000. This request included evidence of his death

sourced from a website, as well as a hyperlink to a video of his funeral.

144.      The request was denied on the grounds that it might potentially infringe upon

personal privacy, 5 U.S.C. § 552 (b)(6) and (b)(7)(c).

145.      The Plaintiff submitted an expedited appeal number A-2023-01871, based on 28

CFR § 16.5(e)(i), an imminent threat to life.

146.      The expedited handling of the appeal was denied informing, "You have not

provided a statement certified to be true and correct, nor have you provided any facts to

support your assertion that expedited processing is warranted under standards one and

three."

147.     **Conclusion**:  In light of the presented evidence, information, and beliefs, it is

evident that higher authorities within the FBI have disrupted the operations of US

Consular Assistants, FBI agents, and Civil Police in Brazil, preventing them from adhering

to established policies and carrying out their responsibilities. This disruption has led to

an immediate and substantial threat to the Plaintiff's safety, as well as the well-being of

witnesses. The resulting environment facilitates coercion, evidence tampering, and

interference with witnesses without consequences which prevents the Plaintiff from

pursing justice by obtaining witness testimony and evidence.

148.     As a result, it is of paramount importance that the Plaintiff promptly gains access

to comprehensive FOIA records. This access is crucial not only for the protection of all

individuals involved but also to preserve the integrity of the ongoing investigation.

**Likelihood of Irreparable Harm**

149.     By providing the name of the individuals who sent the emails from

BrasiliaACS@state.gov between August 24 and August 25, 2022, it will likely prevent

them and others from continuing to make false statements and tamper with the

witnesses and Plaintiff.  Otherwise, it will allow further acts of obstruction without

consequences.

150.     By providing the email sent from the DOJ Civil Rights division in February 2021

and the name of the sender, it will prevent any concealment or distortion of the truth.

151.     Safety: Ongoing witness tampering, harassment, and the looming potential of

physical and financial harm to both the Plaintiff and witnesses will inevitably lead to

irreparable damage to the investigation. Therefore, an order against retaliation is

urgently required to ensure the safety of all parties involved, thereby safeguarding their fundamental constitutional rights to life, liberty, and security.

152.     Integrity of Evidence: The alteration, inaccessibility, and destruction of some evidence raise significant concerns about the potential loss of additional evidence. This jeopardizes the Plaintiff's constitutional rights to access the courts, due process, and a fair adjudication of their claims. Preserving the integrity of the evidence is essential to ensure the protection of their constitutional rights and to prevent further irreparable harm to their ability to present their case effectively.

153.     The Defendants' collective policy violations, false statements, and suspected witness tampering not only contribute to the likelihood of additional irreparable harm but also implicate the constitutional rights of the Plaintiff and other affected parties. These actions undermine fundamental rights such as freedom of speech, due process, protection against retaliation, and the right to a fair and impartial legal process.

**Probability of Success on the Merits**

154.     The Plaintiff seeks a preliminary injunction based on the probability of success on the merits of his claims. This motion demonstrates that the Plaintiff is likely to succeed on their Federal Torts Claim for Negligence, Fraudulent Misrepresentation, Intentional Infliction of Emotional Distress, Bivens claims for violation of the Privacy Act, First, Fourth, and Fifth Amendments, and a RICO Act claim. The Plaintiff justifies the need for immediate injunctive relief to prevent further harm and maintain the status quo pending a final resolution of the case.

155.    The Bureau of Consular Affairs negligently approved US visas for known foreign criminals, breaching their duty of care and causing the Plaintiff ongoing financial losses and severe emotional distress.

156.    The Consular Affairs employees violated their duty of care by making false statements about the Plaintiff's parents, their records, the Privacy Act and hindering the Plaintiff's attempts to report FBI misconduct, directly creating emotional stress.

157.    The FBI neglected its duty to inform and protect individuals by failing to take reasonable steps to warn and safeguard the Plaintiff from criminal activities that have resulted in his financial and emotional downfall.

158.    When the FBI was informed of corruption and retaliation that involves FBI misconduct, they neglected to follow policy procedures and denied having the authority to act.  The Plaintiff was also misled with false statements to obstruct him from reporting details to the proper agency resulting in heightened emotional distress and financial losses.

159.    Intentional Torts by Defendants: The Plaintiff asserts claims for intentional torts, including intentional infliction of emotional distress, fraud, and conspiracy, supported by evidence of harassment, witness tampering, and interference with investigations.  Which has caused great emotional distress.

160.    Bivens Claim for Violation of First Amendment Rights to Free Speech and Petitioning the Government for Redress and Grievances: The Plaintiff's claim alleges a violation of his First Amendment rights, supported by evidence of unlawful acts of intimidation, obstruction, and retaliation by the Defendants.

161.     Bivens Claim for Violation of Fourth Amendment, Unreasonable Searches and

Seizures: The Defendants' unauthorized acquisition and utilization of the Plaintiff's

private information, their false assertions to compel him to sign the Privacy Act, and

their misrepresentations of Foreign Affairs Manual policies to gain access to the

Plaintiff's private information, collectively violated his Fourth Amendment rights. This

includes his reasonable expectation of privacy, which was infringed upon due to their

actions.  Directly resulting in heightened emotional distress and financial losses.

162.     Bivens Claim for Violation of Fifth Amendment, Due Process: The Defendants

violated the Plaintiff's Fifth Amendment rights by depriving him of liberty and property

interests, including the ability to communicate freely with family, report crimes and seek

employment without the due process of law.

163.     The unauthorized acquisition and utilization of the Plaintiff's private information,

Brazilian police reports and evidence, obtained without proper authorization was

distributed to witnesses and interfered with their testimony.  Directly resulting in

heightened emotional distress and financial losses.

164.     Bivens Claim for Violation of the Fifth Amendment, Equal Protection:  FBI agents,

through their actions or omissions, allowed certain individuals to engage in fraudulent

activities, ignored their responsibilities, or showed preferential treatment, thereby

violating the Plaintiff's right to equal protection under the law resulting in severe

financial losses and ongoing emotional distress.

165.     American Citizen Services at the US Consulate violated the Privacy Act by

compelling the Plaintiff to complete the waiver to get assistance from the US Consulate.

There were also false representations that the Plaintiff's parents signed the Privacy Act Waiver, but they were unable to share their records.  Furthermore, the Plaintiff's private information was sent from the Civil Police to the US Consulate and that information was used to tamper with witnesses.

166.     Rico Act Claim: The Plaintiff has demonstrated, with compelling evidence, the existence of a coordinated enterprise involving individuals and federal agents. This enterprise is engaged in activities that constitute financial scams, victim intimidation, and obstruction of justice.

167.     Pattern of Racketeering Activity: The evidence presented by Plaintiff establishes a pattern of racketeering activity that spans almost two decades and includes fraudulent business schemes, extortion, and obstruction of justice. The numerous instances of criminal conduct reflect a systematic effort by Defendants to further the goals of the enterprise.

168.     Causation and Proximate Cause: The financial losses, reputational harm, and emotional distress suffered by Plaintiff are direct results of Defendants' actions within the enterprise. The evidence establishes a clear causal link between Defendants' racketeering activities and the injuries sustained by Plaintiff.

169.     Conclusion: Based on the evidence presented, the Plaintiff has demonstrated a high probability of success on the merits of their claims. Therefore, the Plaintiff requests the Court to grant a preliminary injunction to prevent further harm and maintain the status quo pending a final resolution of the case, ensuring the protection of the Plaintiff's rights and interests.

**Balance of Equities**

170.     The balance of equities weighs heavily in favor of granting the preliminary injunction. The safety, liberties and constitutional rights of the Plaintiff, suspects and witnesses are at stake.  The potential harm to witnesses and alteration of evidence significantly outweighs any potential inconvenience or disruption caused by the injunction.  This preliminary injunction is not aiming to restrict the Defendants authority but to ensure that they uphold the constitution and abide by laws and their policies.

**Public Interest**

171.     Protecting the safety of individuals involved in investigations and upholding the integrity of the justice system is in the public interest. Granting the preliminary injunction ensures that due process is followed, evidence is preserved, prevents further acts of violence, threats, obstruction of justice and witness tampering.

**Conclusion**

172.     The safety of everyone involved and the integrity of the investigation are of paramount importance. The evidence presented necessitates immediate court intervention in the form of a preliminary injunction. Granting this relief will not only protect the Plaintiff and individuals involved but also uphold the principles of justice and due process.

VERIFICATION

I, Russell J Terry, declare as follows:

1.  I have personal knowledge of the facts set out in the foregoing MEMORANDUM OF

    POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUCTION

    except as to those matters stated upon the basis of information and belief, and if called

    on to testify, I would competently testify as to the matters stated herein.

2.  I verify under penalty of perjury under the laws of the United States of America that the

    factual statements in the MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

    MOTION FOR PRELIMINARY INJUCTION concerning myself, my activities and my

    experiences are true and correct.  28 U.S.C. item 1746.

        Executed on August 3 1, 2023

                                                    Russell J Terry